IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                        Case No. 09-40031-01/02-SAC

GONZALO P. MALDONADO and
MANUEL GARCIA a/k/a
Tomas Pimental-Legrand,

                    Defendants.

MEMORANDUM AND ORDER

        This case comes before the court on motions to suppress filed by both

defendants and opposed by the government. The court held an evidentiary hearing on

July 22nd, and, at the request of defendant Garcia's counsel, permitted the parties to

brief the issues thereafter. No briefs were subsequently filed.

**Facts**

        On February 17, 2009, at approximately 8:57 a.m., Trooper Wolting of the

Kansas Highway Patrol stopped the defendants on I-70. Defendant Maldonado was

driving the vehicle and defendant Garcia was its sole passenger. Trooper Wolting

testified at the hearing in a clear and credible manner. He stated that he followed the

vehicle[1] for two or three minutes and stopped it for three reasons: 1) because within a

one-mile span, it hit the center line twice and went over it once; 2) because its licence

tag was so dirty that he could not read its month or year of expiration and thought it

_____

        [1]This court disagrees with *United States v. Maldonado*, 614 F.Supp.2d 1179 (D.
Kan. 2009), to the extent it implies that an officer needs reasonable suspicion to follow a
vehicle.

might be expired; and 3) because dispatch had advised him that the vehicle's registration was not on file.

Upon his initial approach to the vehicle, Trooper Wolting wiped some dirt off its licence tag, enabling him to read the expiration date and see that it had not expired. He then approached driver Maldonado and explained the reasons for the stop. As he did so, defendant Garcia told the Trooper that driver Maldonado did not communicate very well in English. Trooper Wolting thereafter directed his conversation throughout the remainder of the encounter to defendant Garcia, and defendant Maldonado remained silent throughout it.

Defendant Garcia said the car belonged to a friend of his, then said that it belonged to the men's employer, whom he identified only as "Michael." He showed the trooper a business card for a painting and drywall business bearing the name of Michael Laviolette. Defendant Garcia said that he was retired and worked part time at that business.

Defendant Garcia told Trooper Wolting that they were traveling from Sacramento, California to Kansas to attend a concert at 635 and 83rd Street. When the trooper asked what city, defendant Garcia responded "Kansas," then confirmed "Kansas City," only when prompted by the trooper. Trooper Wolting's impression was that defendant Garcia was "very nervous," talked more and spoke faster than was usual for persons involved in a normal traffic stop.

The Trooper then returned to his vehicle. He confirmed that defendant Maldonado's license was valid, but found that the vehicle's registration was not on file in California, and that no owner information was available under its license tag number. He

2

was informed that the vehicle had been salvaged so ran its vehicle identification number (VIN) but learned that the tag was not associated with that vehicle and that the last tag assigned to the vehicle was in 2007. The vehicle was not reported to be stolen, but he was not able to learn who owned it. He also learned that the same vehicle had been stopped for a traffic violation in Thomas County, Kansas, eleven days earlier.

Trooper Wolting then re-approached the vehicle and asked if there was another registration for the vehicle, explaining that the registration the defendants had given him did not go with the tag. Defendant Garcia responded by saying they had sent the paperwork in, and were still waiting for it.

Defendant Garcia asked about his driver's license, volunteering that he did not have a valid driver's license in California but hoped to obtain one in Kansas, and asked for the trooper's assistance in so doing. Defendant Garcia stated that they were going to visit two friends and a nephew in Kansas City. Trooper Wolting then issued a written warning to defendant Maldonado, explaining that it was for failing to maintain a lane and for the registration violation. He returned to defendants all the paperwork he had taken from them, and said, "No ticket. Just a warning. Thank you." He left the passenger window, walked to the rear of the vehicle, then returned to the passenger window where he asked in a normal tone of voice whether he could ask the men a few more questions. Defendant Garcia responded affirmatively, without hesitation. As before, Defendant Maldonado remained silent.

In response to his questions, Trooper Wolting was told by defendant Garcia that both defendants live in California, that they were friends and not relatives, that they were going to Kansas City to visit two friends and his nephew, that they were staying

3

about a week, and that he was maybe going to try to get his driver's license in Kansas. When Trooper Wolting asked about the car's ownership, defendant Garcia said it belonged to his friend and that he and defendant Maldonado worked together for him, doing construction and driveways.

Trooper Wolting then asked whether there was anything illegal in the vehicle, such as "cervesa," "pistoles," drugs, or illegal aliens. After each stated example, defendant Garcia interjected, "No, no," and after the last example he said, "No, we don't have nothing." The Trooper, still using a conversational tone of voice, asked, "Can I look?" and defendant Garcia replied, "Yes, you can look." Defendant Maldonado offered no objection, but remained silent, as he had throughout their encounter. The Trooper then asked the men to exit the car and to step away from the vehicle, which they did.

The Trooper then searched the car for approximately ten minutes, including its front and back seats, its trunk, and its undercarriage. During the search, he noticed a "very strong odor" of air freshener under the driver's seat, and three different types of laundry detergent in the trunk. He knew that the air fresheners and laundry detergents are often used as masking agents to cover up the odor of illegal drugs, and found it unusual for a person to have three types of laundry detergent in the trunk during a cross-country trip. At this point, he was suspicious that the men were trafficking drugs in the vehicle. He also found it unusual that although clothes were on hangers, they were laid in the back seat instead of hanging up, and that there was minimal luggage for the stated length of the trip.

Trooper Wolting then noticed that the color of paint around the gas tank area was different than the color on the rest of the vehicle. This was significant because it

4

indicated an alteration and led him to believe that the vehicle had a hidden compartment near that area. Recalling that the vehicle had been salvaged, he asked the defendants, "When the car was rebuilt, what did they do?" Defendant Garcia replied that work might have been done to the tires because the vehicle made a noise. Trooper Wolting then asked the men if they would follow him to a place where he could look underneath the vehicle, and defendant Garcia quickly replied, "Sure." Trooper Wolting's impression throughout the encounter was that defendant Garcia was in charge, since he alone spoke to him and defendant Maldonado gave no appearance of any disagreement with defendant Garcia.

Defendants followed Trooper Wolting approximately fifteen miles to the Ellsworth Service Center, which had an overhead lift he could use. Soon thereafter, defendant Maldonado left the place where the trooper had asked him to stand and ran across the highway into a ditch. Trooper Wolting reentered his patrol car and captured defendant Maldonado with the assistance of another trooper who was just approaching at the time. When defendant Maldonado saw the troopers coming toward him with their patrol car lights flashing, he turned around and walked toward them. Handcuffed and placed in the back of a trooper's cruiser, defendant Maldonado was returned to the Service Center.

Soon thereafter, a concealed compartment containing methamphetamine was found in the vehicle near the discolored paint. Both defendants were given Miranda warnings at approximately 9:53 a.m. and were transported to the Ellsworth County, Kansas jail, where  DEA Special Agent Cherrington was called to assist.

At the hearing, S.A. Cherrington testified in a clear and credible manner. He

5

stated that he communicated with the defendants through an interpreter, and gave both men Miranda warnings again. Defendant Maldonado declined to speak to the officers, so was asked only routine "booking questions." Defendant Maldonado responded to questions about his name, date of birth, social security number, etc., but when asked about telephone numbers for his relatives, he was unable to provide them from memory and mentioned that the numbers were stored in his cell phone. S.A. Cherrington then asked if he could look in his cell phone, and Defendant Maldonado responded affirmatively, without expressly stating any limitations. S.A. Cherrington, believing that he had consent to examine the entire contents of defendant Maldonado's cell phone, searched its contact list/address book and its call logs which showed recent received, dialed, and missed calls.

**Arguments and Authorities**

**Initial Stop**

Neither party argues in their briefs that the initial stop of the vehicle was illegal. Trooper Wolting issued a warning to defendant Maldonado for driving left of center and for failing to have a valid vehicle registration on file.  Defendant Maldonado's counsel alleges that he never drove left of center but provides no factual basis for that assertion, and raises no legal challenge to the stop.

The court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009), quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Under this standard, the initial traffic stop in this case was

unquestionably legal, as all three stated reasons for the stop are supported by specific facts articulated by Trooper Wolting, and constitute reasonable suspicion of a traffic violation.[2]

**Scope of detention**

Neither defendant challenges the events which occurred prior to Trooper Wolting's return of the documents to the defendants, *i.e.*, the traffic stop. Only the events after the Trooper's reapproach and return of traffic-related documents are in question. The government contends and defendants deny that Trooper Wolting got valid consent to further question the defendants, and also had reasonable suspicion to detain the defendants after the traffic stop ended.

**General law - Terry stops**

---

[2] This court disagrees with the finding in *United States v. Maldonado*, 614 F.Supp.2d 1179 (D. Kan. 2009), that under Kansas law a driver's failure to maintain a lane is not a traffic violation unless the movement poses a danger. K.S.A. § 8-1522(a) does not require a showing of any danger, but merely requires proof of reasonable suspicion that the driver did not purposely move out of the lane and, "thereby, failed to first ascertain that one or more of those departures could be "made with safety." *United States v. Brown*, 234 Fed.Appx. 838, 844-45 (10th Cir. 2007); *United States v. Egan*, 256 Fed.Appx. 191, 195 (10th Cir. 2007) (finding officer's observation of a vehicle straying out of its lane two to three times within a mile "creates reasonable suspicion that the driver violated Kan. Stat. Ann. § 8-1522(a) so long as the strays could not be explained by adverse physical conditions such as the state of the road, the weather, or the conduct of law enforcement,") citing *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003); *United States v. Brown*, 234 Fed.Appx. 838, 844-45 (10th Cir. 2007); *United States v. Zabalza*, 346 F.3d 1255, 1258-59 (10th Cir. 2003); *United States v. Ozbirn*, 189 F.3d 1194,1198 (10th Cir. 1999); *United States v Jones*, 512 F.Supp.2d 1193, 1194 (D.Kan. 2007) (finding that drifting out of a lane just once could provide reasonable suspicion when under the circumstances "the driver could reasonably be expected to maintain a straight course at that time in that vehicle on that roadway."); *United States v. Neeley*, 527 F.Supp.2d 1326 (D. Kan. 2007); *State v. Marx*, 38 Kan.App.2d 598, 171 P.3d 276 (2007).

To be reasonable, a traffic stop must not only be "justified at its inception," but the temporary detention associated with the stop must also be "reasonably related in scope to the circumstances which justified the interference in the first place" *Eckhart*, 569 F.3d at 1273, quoting *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir.1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996). A traffic "stop generally ends when the officer returns the driver's license, registration, and insurance information." *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003), *cert. denied*, 541 U.S. 911 (2004). *See Brendlin v. California,* 551 U.S. 249, 258,127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). "An officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *See Muehler v. Mena*, 544 U.S. 93, 100-101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)." *Arizona v. Johnson*, __ U.S. __,129 S.Ct. 781, 788 (2009).

Here, based on the totality of the circumstances, the court finds that the traffic stop ended when Trooper Wolting returned the defendant's documentation, issued the warning citation, stated "No ticket. Just a warning. Thank you," then left the passenger window and walked to the rear of the vehicle. Having reviewed the video, the court is confident that his inquiries before that termination did not measurably extend the duration of the traffic stop. Before the court reaches the government's contention that the detention was transformed into a consensual encounter and/or that Trooper Wolting reasonably suspected the defendants of criminal activity, the court examines whether the defendants have standing to challenge their detention and the vehicle's search.

**Standing**

8

"Fourth Amendment rights are personal and cannot be claimed vicariously."

*United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "The proponent

of a motion to suppress has the burden of adducing facts at the suppression hearing

indicating that his own rights were violated by the challenged search." *United States v.*

*Allen*, 235 F.3d 482, 489 (10th Cir. 2000) (quotations omitted), *cert. denied*, 532 U.S.

989 (2001).

> Whether a defendant's own Fourth Amendment rights were violated by a
> challenged search turns on the classic Fourth Amendment test: whether the
> defendant manifested a subjective expectation of privacy in the area searched
> and whether society is prepared to recognize that expectation as objectively
> reasonable. This court has held that, in order for a defendant to show such an
> expectation of privacy in an automobile, the defendant bears the burden at the
> suppression hearing to show a legitimate interest in or [a] lawful control over the
> car.

*Id.* (quotations and citations omitted). It is defendants' burden to establish that they had

a legitimate possessory interest in the vehicle.

Here, it is uncontested that neither defendant owned or leased the vehicle.

Instead, defendants assert only that the vehicle belonged to a friend, their boss.

> "[A] defendant need not submit legal documentation showing a chain of lawful
> custody from the registered owner to himself." *Hocker*, 333 F.3d at 1209. Where,
> as here, "the proponent of a motion to suppress is ... not the registered owner ...
> the proponent bears the burden of establishing 'that he gained possession from
> the owner or someone with authority to grant possession.' " *Id.* (quoting *United
> States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990)). We consider: "(1) whether
> the defendant asserted ownership over the items seized from the vehicle; (2)
> whether the defendant testified to his expectation of privacy at the suppression
> hearing; and (3) whether the defendant presented any testimony at the
> suppression hearing that he had a legitimate possessory interest in the vehicle."
> *Allen*, 235 F.3d at 489.

*Eckhart*, 569 F.3d. at 1274-75. *See United States v. Parada*, __ F.3d __, No. 07-3272

(Aug. 25, 2009).

In this case, none of the three factors above is shown by the evidence.  No link

between these defendants and the true owner of the vehicle has been shown.

> A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner. *See United States v. Betancur*, 24 F.3d 73, 77 (10th Cir.1994) (holding the borrower of a car lacks standing where the car registration indicates it is owned by someone other than the alleged lender and the borrower fails to present any evidence of a linkage between the lender and registered owner); *United States v. Martinez*, 983 F.2d 968, 973 (10th Cir.1992) (holding the driver of a car lacks standing where she claims she borrowed the car from a friend, who in turn borrowed it from a third person, who was not shown to be connected in any way with the registered owner); *Arango*, 912 F.2d at 445-46 (denying standing to defendant who borrowed the vehicle from a person whom he knew was not the registered owner and who provided no evidence suggesting the lender was in lawful possession of the vehicle); *United States v. Erwin*, 875 F.2d 268 (10th Cir.1989) (denying standing to defendant who did not introduce any evidence at his suppression hearing to establish his legitimate possession of the vehicle).

*Eckhart*, 569 F.3d at 1275.

Defendant Garcia told Trooper Wolting that the car belonged to his friend and their boss, Michael Laviolette, for whom he worked part time, and showed Trooper Wolting a business card for Mr. Laviolette's business. No evidence showed that Mr. Laviolette loaned the vehicle to either of these defendants for any purpose, and no explanation was offered how either defendant came into possession of it.

Even if Mr. Laviolette's permission for the defendants to use the vehicle is reasonably inferred from the facts, no evidence shows that Mr. Laviolette was the owner of the vehicle or had the authority to grant possession of it. *Compare Valdez Hocker*, 333 F.3d at 1210. The court recognizes that even a slight connection to the lawful owner of a vehicle may suffice to establish standing. *See United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir.1993) (finding standing where the defendant stated that he borrowed the automobile from his uncle, the registration matched his uncle's name, and the car had not been reported stolen.) But where a defendant fails to establish any

10

connection to the lawful owner or a person with authority to grant possession, no standing exists. *United States v. Campos-Campos*, 198 F.3d 259, 1999 WL 987359, 3 (10th Cir.1999). *See United States v. Betancur*, 24 F.3d 73, 76 (10th Cir.1994) (finding the borrower of a car lacks standing where its registration indicates it is owned by someone other than the alleged lender, and the borrower fails to present any evidence linking the two); *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir.1990); *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990); *United States v. Rascon*, 922 F.2d 584, 586-87 (10th Cir.1990) (fact that friend loaned car to defendantis insufficient to show that friend had lawful possession of car), *cert. denied*, 500 U.S. 926 (1991); *United States v. Erwin*, 875 F.2d 268 (10th Cir.1989) (no standing where defendant did not introduce evidence to establish his legitimate possession of vehicle); *United States v. Erickson*, 732 F.2d 788, 790 (10th Cir.1984).

Here, the facts fail to show whose name was on the registration the defendants gave Trooper Wolting. But even if that registration were in Mr. Laviolette's name, Trooper Wolting found that the registration was not associated with the vehicle that the defendants were in. Trooper Wolting tried to determine the ownership of the vehicle not only by asking the defendants about it and by running its license tag, but also by examining its registration and by running its VIN. Each effort was unsuccessful. Although the vehicle was not reported as stolen, no evidence tended to show that its owner was Mr. Laviolette. Under these circumstances, the court finds that the defendants have failed to show the requisite possessory interest in the vehicle to give rise to a reasonable expectation of privacy as necessary to directly challenge its search.

Nonetheless, each defendant may "contest the lawfulness of his own detention

and seek to suppress evidence found in the vehicle as the fruit of the [defendant's]

illegal detention." *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir.), *cert.*

*denied*, 531 U.S. 887 (2000) (citations omitted).

> To successfully suppress evidence as the fruit of an unlawful detention, a
> defendant must first establish that the detention did violate his Fourth
> Amendment rights. The defendant then bears the burden of demonstrating a
> factual nexus between the illegality and the challenged evidence.

*Nava-Ramirez*, 210 F.3d at 1131(citation and quotation omitted). To satisfy the nexus

requirement, a defendant must show the evidence he seeks to have suppressed "would

never have been found but for his, and only his, unlawful detention." *United States v.*

*DeLuca*, 269 F.3d 1128, 1133 (10th Cir. 2001) (emphasis omitted). When the detained

defendant is a mere passenger in vehicle belonging to another person, this court has

determined he must show "that had he ... requested permission or otherwise attempted

to depart the scene, he would have been able to leave in [the owner's] car."

*Nava-Ramirez*, 210 F.3d at 1131.

Defendants are unable to meet this burden. Because defendant Garcia told

Trooper Wolting that he had no driver's license, it would be unreasonable to believe that

the Trooper would have permitted him to illegally operate the vehicle after the traffic

stop ended. Further, Trooper Wolting affirmatively stated at the hearing that he would

not have permitted either defendant to take the vehicle and leave after the traffic stop

ended, even if they had possessed a valid driver's license. Accordingly, neither

defendant can show the evidence he seeks to have suppressed would not have been

found but for his, and only his, unlawful detention.

**Consent**

Because the defendants lack standing, there is no need to examine the constitutionality of the search. Nonetheless, the court does so as an alternative basis for its ultimate conclusion.

**Authority to consent**

Defendant Moldonado contends that any consent given by defendant Garcia was invalid even if voluntarily given, because defendant Garcia lacked sufficient authority over the vehicle to consent to their detention or its search. Defendant Maldonado claims that because he had a valid driver's license and passenger defendant Garcia did not, he alone had sufficient control and authority over the vehicle to consent to its search, and no allegation is made that he consented. Defendant Maldonado additionally contends that Trooper Wolting had a duty to investigate the passenger's control over the vehicle, and that the Trooper should have asked defendant Maldonado for consent either through the passenger or through an interpreter. The government argues that defendant Garcia had both actual and apparent authority to consent to the search, since both men had "mutual use of the vehicle by virtue of joint access with the owner at the time the vehicle was stopped..." Dk. 33, p. 36.

**General law - consent searches**

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "The [Fourth Amendment] prohibition does not apply ... to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Illinois v.*

13

*Rodriguez*, 497 U.S. 177, 181, 185-86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

A vehicle search pursuant to voluntary consent from a third party with authority over the vehicle does not violate the Fourth Amendment. *See id*; *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). A law enforcement officer may conduct a warrantless search of a vehicle "if a person in control of the vehicle has given his voluntary consent to the search." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). A person who lacks any common authority over the automobile cannot validly consent to its search. *United States v. Campos-Campos*, 198 F.3d 259, 1999 WL 987359 at *4 (10th Cir. 1999), citing *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

> The authority which justifies the third-party consent does not rest upon the law of property, ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes[.]

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988. In determining whether the consenting person had such authority, "[t]he relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that [the party] had authority over the [vehicle]." (Citations omitted.) *United States v. Chavez Loya*, 528 F.3d 546, 554 -555 (8th Cir. 2008).

Either actual authority or apparent authority can give rise to valid third-party consent.

> Valid third party consent can arise either through the third party's actual authority or the third party's apparent authority. A third party has actual authority to consent to a search if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.... [A] third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent.

*United States v. Andrus*, 483 F.3d 711, 716 (10th Cir.2007), *cert. denied*, --- U.S. ----, 128 S.Ct. 1738, 170 L.Ed.2d 542 (2008) (internal quotation and citation omitted) (citing *Georgia v. Randolph*, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006)). *See United States v. Kimoana*, 383 F.3d 1215, 1221-1222 (10th Cir. 2004).

A passenger may have common authority to consent to a full search of a vehicle based upon the principle defined by the Supreme Court in *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988. *See generally United States v. Lopez*, 777 F.2d 543, 548 (10th Cir.1985); *United States v. Espinosa*, 782 F.2d 888 (10th Cir.1986) (both addressing situations in which voluntary consent to the search was given by the driver and the passenger). Thus in *Chavez Loya*, 528 F.3d 546, the court found it reasonable for a Trooper to believe that the passenger had common authority to consent to a search of the entire vehicle because of three factors: 1) the passenger, upon Trooper's request, opened the glove box and removed the registration without any help or direction from the driver; 2) the passenger responded to the Trooper's question about the vehicle's ownership, while the driver remained silent; and 3) the driver gestured toward the passenger when the Trooper asked the driver for permission to search the car, and the Trooper understood this motion to mean that he should ask the passenger for permission to search.

Common authority is generally established by showing some possessory interest in the vehicle itself. See *United States v. Miller*, 2007 WL 1035019, 9 (E.D.Ky. 2007). *Compare United States v. Wogan*, 356 F.Supp.2d 462, 467 (M.D.Pa. 2005) (finding no reasonable basis for believing mere passenger had authority to consent where he did not give any indication that he exercised any control over the vehicle in general or the trunk in particular.) Where neither the passenger nor the driver has a possessory interest in

15

the vehicle, superior knowledge about the vehicle and its control may be sufficient.

> At a minimum, a passenger without a possessory interest in the automobile must "show[ ] particular knowledge about the car and its control or dominion" to establish common authority. *See United States v. Ospina*, 682 F.Supp. 1182, 1185-86 (D.Utah 1988).

*Miller*, 2007 WL 1035019, 10. *See  United States v. Botchway*, 433 F.Supp.2d 163, 169 (D.Mass. 2006) (finding it reasonable for trooper to conclude that passenger had authority to consent to the search of the car because driver stated he did not know who owned the car, did not produce a registration for it, passenger said the vehicle belonged to his girlfriend, and no other occupant objected to the search); *United States v. Ospina*, 682 F.Supp. 1182, 1185-86 (D.Utah 1988) (holding that a passenger had common authority over a vehicle where he exhibited "particular knowledge about the car and its control or dominion" by responding to an officer's request to a vehicle's occupants by opening the glove box and retrieving the registration; answering officer's questions about a sticker on the car window; and providing the keys to the officer to search the trunk); *United States v. Benitez-Soto*,1998 WL 214724, 7-8 (D.Kan.1998) (finding that a trooper could reasonably conclude that the passenger had authority to consent to the search of the vehicle because the passenger was the newly designated driver and the only occupant of the vehicle who knew the full name of the owner of the vehicle and was the person to whom the owner had loaned the truck.)

The court rejects defendant's contention that Trooper Wolting should have investigated further. "Where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007), quoting *United States v.*

16

*Kimoana*, 383 F.3d at 1215,1222 (10th Cir. 2004). Here, no ambiguous facts were presented to Trooper Wolting relating to authority. Defendant Garcia alone responded to all questions regarding ownership, identified the vehicle as belonging to his friend and boss, and presented a business card from that business. Defendant Maldonado never objected to, disagreed with, or contradicted Defendant Garcia's statements in any manner. Under the circumstances, Trooper Wolting reasonably, even if erroneously, believed that defendant Garcia had authority to consent to further questions and to a search.

### Voluntariness of consent

Defendant Maldonado claims he was never asked for consent and never spoke to Trooper Wolting after the initial encounter because he made it known that he does not speak English. Instead, the Trooper asked only the passenger, defendant Garcia, more questions, and did not permit Defendant Garcia to translate. Defendant Maldonado further contends that the Trooper leaned into the passenger window and this constituted an "overbearing show of authority" which terminated any consensual encounter. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). Defendant Maldonado also contends that after Trooper Wolting supposedly terminated the traffic stop, he again asked questions concerning the car's registration, the car's ownership, and defendant Garcia's lack of driver's license, unreasonably lengthening the traffic stop and making them feel constrained to stay. Lastly, defendant contends that the totality of the encounter led him to an objectively reasonable belief that he was not free to leave, so that any consent given was not voluntary.

The government bears the burden of showing that the defendant's consent was

17

voluntary. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir.1996). To establish
voluntariness, the government must proffer clear and positive testimony that consent
was unequivocal and specific and freely and intelligently given and must prove that
consent was given without implied or express duress or coercion. *Id.* at 719 (quoting
*United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir.1996)). Consent to search may be
voluntary even though the consenting party is being detained when consent is given.
*United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir.1997).

Whether a defendant freely and voluntarily consented to the search of the vehicle
is a question of fact based on the totality of the circumstances. *United States v.
Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004). The court considers whether the
officer's conduct constituted a coercive show of authority such that a reasonable person
would believe he was not free to "decline the officer's requests or otherwise terminate
the encounter." *Id.* (internal quotation marks and citation omitted). Relevant factors
include:

> the threatening presence of several officers; the brandishing of a weapon by an
> officer; some physical touching by an officer; use of aggressive language or tone
> of voice indicating that compliance with an officer's request is compulsory;
> prolonged retention of a person's personal effects such as identification and plane
> or bus tickets; a request to accompany the officer to the station; interaction in a
> nonpublic place or a small, enclosed place; and absence of other members of the
> public.

*United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir.1999) (examining consensual
encounter), *cert. denied*, 531 U.S. 830 (2000); *see Soto*, 988 F.2d at 1557-58 (evaluating
similar factors in context of investigative detention).

Here, Trooper Wolting testified that he used a conversational tone throughout the
encounter, used no force, and ceased all physical contact with the vehicle before asking

18

for and receiving permission to continue questioning the defendants after his termination

of the traffic stop. His testimony is supported by the videotape of the stop. Because

defendant Garcia had apparent authority to consent and defendant Maldonado sat mute

throughout the encounter, Trooper Wolting had no reason to seek defendant

Maldonado's consent. The facts do not show that defendant Maldonado ever requested

that defendant Garcia interpret for him or that Trooper Wolting refused such a request.

Under the facts presented at the hearing and those revealed in the videotape, the court

finds that at no time did Trooper Wolting engage in a coercive show of authority, that the

detention ended as noted above, that the consents given by defendant Garcia were

voluntarily made, and that the trooper's interaction with the defendants remained a

consensual encounter throughout the search.

### Scope of consent to search

Defendant Maldonado additionally appears to contend that the search of the

vehicle exceeded the scope of Garcia's consent. He claims that Garcia's agreement for

the Trooper to look in the vehicle meant only that the trooper could look for the presence

of illegal aliens in the vehicle. This argument flows from the colloquy between Trooper

Wolting and Defendant Garcia, as noted in the facts above.

The scope of a search is generally defined by its expressed object. *Florida v.*

*Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The standard for

measuring the scope of a consent is, objectively, what a reasonable person would have

understood by the exchange between the officer and the suspect as to the intended

scope of the search. *Id.; United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir.1995).

Considering the "totality of the circumstances" and viewing the evidence in the light most

19

favorable to the government, the court determines "[w]hether a search remains within the boundaries of the consent" given. *United States v. Pena*, 920 F.2d 1509, 1514-15 (10th Cir.1990), *cert. denied*, 501 U.S. 1207 (1991).

The court has listened to the flow of the conversation as recorded on the videotape. Trooper Wolting's pace of questioning and his listing of examples was rapid, and defendant Garcia's interruptions were frequent. Based upon the delivery of that conversation, the court finds that a reasonable person in Trooper Wolting's position would have understood that he had asked for and had received consent to search the vehicle for the presence of alcohol, guns, drugs, or illegal aliens, and other illegal items. The trooper was justified in looking in any place in the vehicle which could harbor any such item, including underneath the vehicle where the hidden compartment was found. Because the court finds a consensual encounter followed by valid consent for the search, it declines to reach the government's contention that reasonable suspicion also justified the detention.

### Movement of vehicle

Defendant Maldonado additionally contends that consent was necessary and was not given to move the vehicle and himself from the stop site to the Ellsworth Service Center where a more thorough search of the vehicle was performed. Trooper Wolting asked the defendants to follow him, but he never asked this defendant for consent to move the vehicle.

The facts reveal that Defendant Garcia consented to moving the vehicle and that Trooper Wolting was justified in his belief that defendant Garcia had authority to do so. But even in the absence of consent, the facts show that by the time Trooper Wolting

asked the defendants to follow him, he already had a firm belief that the vehicle contained a hidden compartment, giving him probable cause to believe that the defendants were engaged in a crime. The vehicle was large enough that the very presence of a hidden compartment would lead a reasonable officer to conclude that the compartment was highly likely to contain contraband. *See United States v. Zavala*, 195 Fed.Appx. 746 (10th Cir. 2006); *United States v. Ledesma*, 447 F.3d 1307, 1316 (10th Cir. 2006). Thus even assuming that Trooper Wolting ordered the vehicle to be moved, his acts were legal. *See Ornelas v. United States*, 517 U.S. 690, 693, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).[3]

The court disagrees that defendant Maldonado was arrested prior to the trooper's detection of the hidden compartment. The court finds it unnecessary to reach the government's contention that even if a Fourth Amendment violation occurred, the evidence need not be suppressed because the officers acted in good faith and suppression would not serve the purpose of deterrence. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405 (1984); *Herring v. United States*, 129 S.Ct. 695, 700 (2009).

**Search of cell phone**

Defendant Maldonado challenges the search of his cell phone after he was arrested. He appears to claim that any search of his cell phone for information other than the specific numbers requested for booking purposes is beyond the scope of his consent.

---

[3] *State v. Henning*, __ Kan. __, 2009 WL 1811200 (2009), which held KSA 22-501(c) facially unconstitutional, does not alter this result, as the search incident to arrest exception examined there is inapplicable here.

21

**No search**

The government first contends that defendant Maldonado lacks an expectation of privacy in the address book type of information in his cell phone. Just as there is no reasonable expectation of privacy in numbers called or numbers calling, because they are voluntarily turned over to third parties, *see Smith v. Maryland*, 442 U.S. 735 (1979), there may be no reasonable expectation of privacy in a cell phone's recent call directory or phonebook directory. *See United States v. Fierros-Alavarez*, 547 F.Supp. 2d 1206, 1210-11 (D.Kan. 2008). Where a defendant fails to show that he has a reasonable expectation of privacy in the numbers searched, or that the numbers searched disclosed more than the "addressing information" that would be revealed by a pen register, his claim of an unreasonable search fails. *See id* ; *United States v. Perrine*, 518 F.3d 1196, 1204-05 (10th Cir. 2008); *United States v. Forrester*, 512 F.3d 500, 509 (9th Cir. 2008). This is the case here.

**Scope of search**

Alternatively, even assuming that defendant Maldonado had a reasonable expectation of privacy in some of the information retrieved by the agent, the court finds that the search fell within the bounds of consent given by the defendant.

The scope of a search is generally defined by its expressed object. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The standard for measuring the scope of a consent is, objectively, what a reasonable person would have understood by the exchange between the officer and the suspect as to the intended scope of the search. *Id.; United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir.1995). Considering the "totality of the circumstances" and viewing the evidence in the light most

favorable to the government, the court determines "[w]hether a search remains within the boundaries of the consent" given. *United States v. Pena*, 920 F.2d 1509, 1514-15 (10th Cir.1990), *cert. denied*, 501 U.S. 1207 (1991).

The government contends that no boundaries were given by defendant Maldonado and that his general consent validates the search conducted by the agent. The court agrees. Under the circumstances presented here, a reasonable person in the agent's position would have understood by the exchange between the agent and defendant Maldonado that the agent had his permission to look anywhere in his phone that he needed to locate the numbers he had requested. The phone's address book and log of recent calls are places where the numbers requested were likely to be found. No evidence was presented that the agent looked elsewhere.

IT IS THEREFORE ORDERED that the motion to suppress by defendant Maldonado (Dk. 21) and the motion to suppress by defendant Garcia (Dk. 27) are denied.

Dated this 26th day of August, 2009, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge